and I think as you all know, the protocol that we're following is that when the lawyers are arguing, they can take off their masks if they wish to, but should put the masks back on once you're done. So I see we have Mr. Habib for the appellant. You have two minutes reserved for rebuttal and you can begin whenever you're ready. Thank you, Your Honor. May it please the court, Daniel Habib, Federal Defenders of New York, on behalf of Ronnell Watson. Three serious errors compromised this prosecution. First, as the government concedes, the district court's deputy improperly responded to a jury question by conducting an ex parte colloquy with the full jury. The ensuing fight between the deputy and the jurors exacerbated the risk of racial bias already present in this prosecution for an interracial violent crime, and left the jurors afraid that Watson's family meant them harm. Second- Do you have any issue with the procedure that the district court followed? Obviously, it was problematic, but the district court questioned each juror. I think the script that the judge used was approved by both sides. And then the judge made findings that he believed that each of the jurors could still be fair and impartial. So why didn't that cure the improper contact? So, Your Honor, because the error was constitutional in nature in that it denied Mr. Watson his right to presence, this court presumes prejudice and the presumption of prejudice has not been rebutted on these facts for three reasons. Most important, the judge did not adequately address the jurors' fears. We know that at the time of the colloquy with the deputy, several jurors, including jurors one, four, and eight, said that they feared that the presence of people they assumed were Mr. Watson's family with phones in the courtroom endangered their physical safety. Indeed, one juror spoke of needing to take a different subway route home. The next day, however, instead of instructing the jury correctly that Mr. Watson, who was presumed innocent, meant them no harm. And that his family, who were never implicated in any wrongdoing whatsoever in this case, also posed them no harm. The judge responded by essentially informing the jury that security had been beefed up. Disvalidated rather than corrected jurors' concerns. I was going to say, Judge, we want you to ask some questions about safety, or we want you to give this instruction to the jury about there's no safety issues. What was the judge asked to do beyond what he did that he declined to do? It was repeatedly drawn to the judge's attention that focusing on, one, it was drawn to the judge's attention that the jurors were now downplaying obvious concerns about safety and security they had raised the day before. Second, it was drawn to the district judge's attention that placing the emphasis on tightened security the next day, the following day, again, placed the wrong emphasis in the jurors' minds. It told them that their concerns were valid, not that they had no reason to fear. So I'm interested in what the limiting principle might look like. I mean, surely you're not asking us to find a rule that says that a defendant has to be there for every interaction between a judge and a jury. So in this case, where is where we draw the line and it becoming too much? I think that the line was drawn in this court's decision in Meta, which held that an essentially identical inquiry, that is a mid-trial question posed by jurors, that the defendant's conduct or the conduct of the defendant and his family endangers their physical safety, requires the defendant's presence as a constitutional matter and pursuant to Rule 43. But in contrast- Right, but Meta doesn't answer everything, right? Because in that case, the judge didn't examine the jurors, the counsel was not given an opportunity to offer questions, there was no transcript of the meeting, the parties had an incomplete description of the jurors' concern. I don't think Meta gets us there. I agree that Meta is not controlling on the question of prejudice. I was addressing the existence of the right to presence in the first instance, and I think Meta establishes that the right to presence obtained in this situation. In addition, I think Scher establishes that a violation of the right to presence of this nature is presumptively prejudicial. But I agree with your honor on prejudice. What could the defendant have done had he been at the proceeding, or what he would have gained from attending? We pointed to those considerations in Contreras v Artus as important in assessing whether presence is a constitutional necessity or not. So I want to clarify, I'm speaking of presence at the initial interaction between the deputy and the jurors, not the subsequent voir dire. At that voir dire, first of all, the defense could have, number one, ensured that the proceeding did not degenerate in the way that it did. So recall- So we're talking about the interaction between the deputy. Correct. And so, and your position is that the deputy should have, at that point, invited the defendant and his counsel in. I think what this court said in Ronda and in a line of cases culminating Meta is, when met with a substantive jury question, the requirement is, number one, place the question in writing. Number two, afford the party's notice and an opportunity to be heard. Advise the parties of what the proposed response is, and then read the question back to the jury. And none of that occurred here. Well, ideally, yes. But what we've also said is that where a defendant could have done nothing had he been at the proceeding, nor would he have gained anything by attending, there's no constitutional violation. I mean, this was a kind of one-off interaction between the deputy responding to questions, and then the court, as Judge Bianco's pointed out, subsequently took the recommended steps to address whether it affected the jurors in any way. So what could he have done by attending that initial interaction? So several things, Your Honor. First, he could have made the point that was made the next day to Judge Kunsturing-Voirdier, but not effectively implemented, was that the jurors should be instructed that Mr. Watson was presumptively innocent and that they faced no danger. Second, and more importantly, he could have intervened to prevent the degeneration in the colloquy that occurred when juror number four was unable to accept the deputy's explanation that African-American women in the gallery could be attorneys permitted to have phones. That- Well, I was going to say, part of the thing that I'm struggling with is I feel like you're trying to shoehorn a claim of racial bias into a confrontation clause problem in META, right? Like, if the issue is that there was concern of improper racial bias, then aren't we supposed to defer to the district court's finding that they could remain impartial? And so I'm having a hard time understanding why, whether or not you're actually making what at core is a unfair trial because of racial bias or a confrontation clause because neither of them fit well together. Our claim, your honor, is that the district court's improper colloquy with the jurors violated Mr. Watson's right to be present and was both presumptively and actually prejudicial, both because it inflamed the issue of racial bias that was already present on the facts of this case. And- I didn't really see the racial bias, I think the memo that the deputy wrote after it happened, none of the jurors said they can't be attorneys because they're African-American. The judge said that maybe his deputy felt that that was behind some of the questions that were going on. But it was a more general concern that the jurors had. They knew the rules about cell phones, that people couldn't have their cell phones. They see people sitting behind the defendant who have cell phones. And it seems like it's a much more general concern just about people violating the rules of the court and creating a safety issue generally for jurors. And I don't see that as an indication of racial bias. I don't see that as an indication that they can't file the presumption of innocence. You could presume the defendant guilty, but still be concerned if people have cell phones in the courtroom that they're not supposed to have, right? On the issue of racial bias, your honor, all I can do is report what both the deputy and Judge Koontz took away from the interaction. Which is that the deputy's explanation to juror number four was unsatisfactory because as Judge Koontz put it, the juror may have had a profiling perception, Judge Koontz's words, that a woman of color could not be an attorney. Right, but once the judge made the determination that they could be impartial and were free from bias, isn't it our job to decide whether or not that determination is clearly, don't we have to defer to that? Because that is clearly erroneous once they made that determination. I would say, your honor, that this court defers if the court has conducted an appropriate inquiry. And in this case, because no questions about racial bias were posed, the judge's impartiality determination was in essence deference to the juror's self-assessment that she could be impartial. Not an independent assessment based on pointed questions. Let me ask you a question about the self-defense instruction. I understand if a car is pulling away, and I looked at the video, in order to get an instruction, there has to be a reasonable basis for the jury, even if they credit everything most favorably to your client, would allow them to find that that could happen. The car's pulling away from the location, windows up, and your client starts shooting at the person. How could that be, how could someone reasonably believe that that's a robbery or a burglary? Is it progress? So, your honor, as the court is aware, the standard for getting a self-defense instruction is, it's not just whether there's reasonable support in the record for it, it's whether there's any support in the record. However, tenure is so weak or- A reasonable juror could find that it exists, and you could give me a case where anybody has ever found that someone believed a robbery was about to happen when someone's pulling away with their windows up in a car. I don't think you could ever find a case like this. The instruction could be given, as it was, on the issue of whether or not he believed he was in danger because a car might be trying to run him over quickly as it pulled away. That's a different story, but the idea that he should get the instruction that he was defending himself against a robbery or a burglary, I'm having a hard time understanding that. So, your honor, I think this court addressed it in Goldson, which is discussed at some length in our reply briefs. Goldson didn't involve a robbery or a burglary. Goldson was a brick being thrown at the car. So, that goes along with the second theory, which is that he felt he was in danger. Even though the car was pulling away, he felt like he had just been potentially run over, even if it was on the sidewalk, but that's different than a robbery or burglary. No, I think, your honor, in Goldson, so first of all, in Goldson, the holding of this court was that it was a reversible error not to charge the jury on justification. Even though the brick, by all evidence in the record, struck a car that was driving away from the defendant, and indeed was about 20 to 25 feet away from the defendant, was struck in the back with a brick. Indeed, in the record in Goldson, as there was here, there was extensive evidence of the defendant's subjective fear of both robberies and burglaries in his residential community, just as was the case here. So, I do think that Goldson, on that point, whether- I mean, Goldson was no instruction. That's the problem with Goldson, there was no instruction. Whereas here, there was an instruction about him potentially being in fear that his wife was in danger, right? It's only the issue of whether or not it was because there was a robbery or burglary that you're unhappy with the instruction, right? Right, so that's correct. The instruction here was deficient because it told the jury, and both this court and the New York appellate courts have recognized the distinction between deadly force justification and robbery-burglary justification. And I've said that that distinction can be significant on the facts of the case. Here, the jury was instructed that Mr. Watson's actions could only have been reasonable if he believed himself to be in fear of death or serious bodily injury. He said, as a subjective matter, that he thought that the people in the maximum were trying something and were trying to rob him. That belief, in combination with the substantial evidence surrounding this encounter, the burglaries in the neighborhood, the presence of an idling car in front of the home for ten minutes, the car's occupant taking video of the home, the car's occupant refusing to engage with Mr. Watson when he questioned them, and the car's decision to speed directly at Mr. Watson, viewed in the context, again, a complimentary error that the district court made, viewed in the context of his unique physical attributes and prior experience as a robbery victim, was more than enough under the low bar that this court has set in cases such as Dove for an instruction. I mean, all those things were argued to the jury. I read the summation. They talked about his eyesight and his prior experiences with robbery. The jury heard all of that on the issue of whether or not he perceived a threat. The only question is whether or not it was a robbery or a burglary at that point. At that point, whatever was happening before, even if someone was surveilling the house, at the point the car is driving away, nobody could believe this was an attempted robbery or burglary. So, Your Honor, it was argued to the jury, but then it was followed by an instruction that said his actions were only reasonable if he believed himself to be in danger of death or serious bodily injury. So, with respect, the jury didn't have the opportunity to consider the full breadth of the applicable self-defense instruction. Can you talk to me about how two particular portions of the theory matter, like the imminence requirement of the threat and the initial aggressor? Yes. Because I don't see them here. So, as to the latter, Your Honor, I would say two things. One, I would say that it is addressed by Goldson because Goldson was the man, was the initial aggressor in exactly the same way. And two, I think the government agrees in its response brief that if Watson reasonably perceived an attempted robbery or an attempted burglary, that the perpetrator of that offense is the initial aggressor as a matter of law. As to imminence, Your Honor, it's important to recall that this occurred in a matter of literal seconds. Where a man comes home minutes after receiving a phone call from his girlfriend, that we can infer an unfamiliar car with tinted- Well, I'm not sure that helps you because doesn't that get you into trouble with the reasonable point? Like the idea that someone who has bad eyesight and is reacting very quickly, I think, speaks to maybe that wasn't a reasonably formed position. Well, no, Your Honor. Mr. Watson's damaged eyesight and his prior experience as a robbery victim are exactly the sorts of factors that the New York Court of Appeals in both Getz and Wesley said are pertinent not only to his subjective belief, but to the objective reasonableness of his belief. That is, a juror assessing Mr. Watson's self-defense claim was required, as a matter of New York justification law, to, as Wesley puts it, mentally place himself in his shoes. And so I understand, Judge Bianco, your skepticism of the proposition that this situation to you or I could be perceived as an attempted robbery, but respectfully, that's not the inquiry before this court. The inquiry is putting oneself in Mr. Watson's position, seeing the little that he saw- Which still is an object of reasonableness overlay, right? Yes, Your Honor. And looking at the video and watching the car drive past him, not try to hit him, and speed away fast from him, he fires shots that, with his impaired eyesight, successfully hit the car and indeed hit the agent. It's just hard to reconcile that with the narrative of an imminent robbery or an incident at risk. I would say a few things, Your Honor. First, the quantum of proof that's necessary to get the instruction on this point, I would suggest is more akin to reasonable suspicion. And we've collected in the reply brief federal and state cases holding that casing a location combined with flight in a high crime area equals reasonable suspicion. Indeed, Wardlow, the Supreme Court's decision in Wardlow, so holds with respect to flight in a high crime area. Second, it's not out of the question that what actually did occur could have occurred, which is that the attempted robber was not fleeing forever, but fleeing to secure a more advantageous position from which to attack, which is what in fact transpired in this case. Although you could understand also that he was responding to having been shot at. Absolutely, but again, what we're considering is Mr. Watson's vantage point. And Your Honor is quite right, there are both subjective and objective prongs to the test. But I do want to clarify, because it becomes muddied in the government's response brief, that Getz establishes that Mr. Watson's unique physical attributes and his prior experience as a robbery victim pertain both to the subjective and to the objective prong. That is, when a jury is being asked to consider whether his actions are objectively reasonable, they are not evaluating them from the standpoint of themselves or a hypothetical reasonable person with good eyesight. And the jury was made aware of his eyesight issues and different views about the extent of impairment, given that he had a New York driver's license. They were made aware as a factual matter, but they were not given the necessary tool by the district court to apply whatever conclusions they drew from that evidence to the specific, indeed, the principle defense present in this case, and that was the defect in the instruction, which was not harmless. All right, thank you, Mr. Abbi. Thank you. We have two minutes in rebuttal. We'll hear from Mr. Navarro. Good morning, your honors. May it please the court. My name is Francisco Navarro. I'm an assistant United States attorney in the Eastern District of New York, and I represented the government in the district court. The interaction between the district court's courtroom deputy and the jurors was improper, but it did not violate Mr. Watson's rights. The district court promptly contacted the parties, invited their views on how to address the issue, and then conducted a detailed individual voir dire of 12 jurors and four alternates. I'm sorry, do we need to agree that the voir dire cured the error in order to agree with you? Your honor, there was definitely an improper contact. The government concedes that. And the remedy for that in the cases, in Gagnon and Meta, is individual voir dire. It's the most- So, I mean, I'm sorry, go ahead. I was just going to say, so, but the question is, is that if, do we need to find that the voir dire cured it? If we are uncomfortable with the voir dire, how do we still affirm? Your honor, we disagree with the defense that prejudice is presumed here. The cases hold that prejudice is, in fact, not presumed, and I would refer your honors to- In Cher, we said that there's no doubt that there was an unauthorized ex parte communication with jurors, and it's regarded as presumptively prejudicial, citing the Supreme Court and Remmer. So, why is it not, it was improper. Just because it was a deputy, it's the equivalent of the judge having that conversation. It dealt with concerns about security. So, certainly, there had to be, what we sometimes refer to as a Remmer hearing, where jurors are questioned, right? Why isn't it presumed to be prejudicial in these circumstances? And your honor, what I would point to is what the court said in Gagnon, which is that the mere occurrence of the ex parte communication between the court and the juror does not presumptively violate. Of course, that's if it's about something insignificant, but I don't think this falls into the category of insignificant. This is about their fear of their safety related to the defendant's family. So, I don't think you could put it in the category of just a mere incidental conversation about something minor, right? Well, your honor, I think that the sequencing matters here, the sequence of events. And according to the jurors, the initial contact with the courtroom deputy was about simply who is permitted to have cell phones, right? There are people in the courtroom who have cell phones. At that point, the deputy responds for the first time informing the jury that certain categories of people are permitted to have cell phones. Once he does that, that's when the jurors say, well, I'd like to know if the people holding the phones- If the jurors express concerns about their safety. Yes. All right. This is a major event if jurors are expressing concerns about safety related to the defendant's family. So, I have a hard time with the government arguing that this somehow is a mere communication that wouldn't qualify as something that's presumptively prejudicial, but it can be cured by inquiry to the jury, which was done here. Yes. I think there's no question there had to be an inquiry here, right? If we were here, if the judge did no inquiry, you wouldn't be arguing this was a mere incidental contact with a juror that didn't require an inquiry. The government would never argue that, right? That's right, your honor, and that's why we did not oppose the inquiry. In fact, we submitted questions to the district court judge along with the defense counsel. Why wasn't the inquiry sufficient? Why was it sufficient according to the government? They argue it was insufficient. Why do you think it was sufficient? Your honor, we believe that the inquiry was sufficient because each of the 16 jurors, the 12 plus the four alternates, explained that they could be fair and impartial, that they had and would continue to presume the defendant's innocence, and that they could keep an open mind until it was time to deliberate. And what became very clear, and the record reflects this, is going into the conference, there was serious concern about what had taken place, that there had been, as defense counsel put it, a fight that devolved into racial issues. However, the jurors told a very consistent and different sequence of events, which is that they first became aware that certain people could have phones only after the courtroom deputy told them. So there's no racial issue there, your honor. They simply said there are people in the room that have phones. We were not aware that any phones were allowed. Once they became aware, juror number four was very clear about this. I then asked the courtroom deputy, do these people fall into one of the permitted categories, meaning attorneys, marshals, court staff, etc. And at that point is where the courtroom deputy took, as Judge Koontz put it, umbrage at the question. And where it devolved into sort of a back and forth between the jurors about which questions were appropriate for Mr. Jackson to answer. But- Is there a different conclusion that, or a different legal implication if it was a concern of safety versus some implicit racial bias? I think, your honor, it would certainly be a tougher case for the government if the jurors had simply said there are three African American people in the front row, I know attorneys can carry phones, but they can't possibly be attorneys.  So that would just be more explicit. I mean, there's some sort of inference that needs to be drawn here. And what I want to know is in the government's opinion, how would we disentangle how much of this were issues of safety and how much of it were improper racial bias and is there a different result depending on whether or not we're persuaded by the defendant's counsel that there was some implicit bias in all of this? And I think that the way that the cases say to do that is through the voir dire process. And defense was certainly free to suggest questions about race. And the defense certainly thought about it, because if you look at the transcript, the first thing that Ms. Gallant says below is precisely that concern that there was some implicit racial bias. Because from the courtroom deputy's memo, that made sense, because he had the sequencing in a different order than the jury had it. He had them initially saying African American people in the front row can't possibly be attorneys. But the jurors tell a very different story. So defense counsel was aware, they were free to propose questions about racial bias. They did not. So but I think your colleague would say that we are being asked to believe the juror's assessment. And that we need something more when we're talking about guilt or innocence here. Well, Your Honor, what matters is what the impact of this incident was on the jurors. And also whether the jurors exhibited any bias in their answering of the questions. And Judge Koontz meticulously went through the questions with 16 jurors. There was no mention of race in that colloquy. There was no mention of race in the interaction between the courtroom deputy and the jurors. This is again, something that was raised only by the courtroom deputy. So I sort of struggled to see how the district court could have directly addressed it without inserting the issue of race into the incident. Let me ask you about the self-defense instruction. I think they're correct as a matter of law, I want to make sure the government agrees, that in assessing reasonableness under the objective standard, the jurors are to consider a defendant's background and other characteristics, including eyesight problems, as well as the attributes of other persons involved in their past experiences. That, I think, is the law under Wesley, under Getz, right? The government agrees with that, right? Your Honor, the government agrees that certainly the jurors are supposed to be told to put themselves in the place of- Wesley said the jurors must consider the circumstance the defendant found himself in, as well as the defendant's background and other characteristics and the attributes of the other persons involved. And they wanted another sentence to highlight that. I don't think the judge's instruction was inconsistent with that. But certainly, an additional sentence would have highlighted all the different things that would go into these circumstances that confronted the defendant, right? Your Honor, I agree that an additional sentence certainly would have made it more explicit. I can't disagree with that. Why did the government oppose that? Why didn't you just let them ask an additional sentence that was consistent with the law? Your Honor, so the government didn't oppose a self-defense instruction, as the record reflects. No, they wanted an additional, not exactly the way I read it, they wanted a little bit more than that. But Judge Sand's instruction, the standard instructions, has something not quite like that, but does have an additional sentence that talks about past things that preceded the event, right? Well, the instruction did say that the jury should place themselves, they should view it from the perspective of someone in the same facts and circumstances that confronted the defendant. At the time of the occurrence. At the time of the occurrence. And that would certainly include all of the evidence that had come in before about his eyesight and about the prior robbery attempts. The other thing, Your Honor, on the prior experiences. I think it's important to note that unlike Getz, for example, the defendant talked during his post arrest about prior incidents, prior robberies. And the defense has highlighted that as evidence of what was going through his mind. But what they haven't pointed out is that those statements were made in the context of a complete lie to the FBI about what had occurred. The defendant wasn't being truthful like in Getz or Goldson where they're talking about prior robberies. Instead, he was telling the agents a totally fictitious incident, right? Saying that he had just come home and that somebody had just started shooting at him. That he didn't have a gun, that he didn't do anything. It was in the evidence. The government, I assume, introduced that statement, right? The statement was introduced. And what I'm saying- Why can't they argue from that statement that he was, I know the government did argue that he was lying in the rebuttal. They pointed out all these things in their summation. The government said that that was a lie. And they did argue that. I know, but that doesn't necessarily mean you're not entitled to the instruction to argue it, right? You have to testify to get the instruction. No, you certainly don't, Your Honor. But what I'm suggesting is that this case is different than Goldson or McMahon, and in a truth-telling situation, either testimony or admitting their acts, says, by the way, I was fearing robbery for X, Y, Z reasons. Here you have someone who is making up a story about what happened, and as part of that, inserting I had fear of robbery. So there really was no objective evidence that he was in actual fear of a robbery or a burglary. Could you take a minute before your time expires to address the argument made by the appellant about the comments made by the court at the end of sentencing, in which the court went on at some length, including quoting the Gettysburg address, and said about the qualities of Agent Harper, that the court cannot consecrate nor howl your heroic actions that day and the days that have followed. And went on about marvelous qualities in Agent Harper, the qualities of the victim. And then at the very conclusion, having gone through the 3553A factors, but said for all the reasons above, the court now sentences the defendant to 382 months. This was the first time offender, and yes, that was a guideline sentence at the very top of the guidelines. But I am concerned that the court went on really extensively about things that were not necessarily in the record, that there were about, again, qualities of Mr. Harper as an agent that suggested that this was some kind of retribution. When he said that the court or the law will always have your back. And boom, first time offender, very top, 382 months. Why should that not be a concern? Your Honor, I think when viewed in context, what Judge Kuntz was trying to do was to recognize the agent who had just given a very, and this obviously doesn't come across in the record, but a very emotional victim impact statement, both the agent and his wife. A very tearful impact statement that had moved everyone in the courtroom. And I think Judge Kuntz felt a need to recognize the courage that it took. Couldn't he have done that without saying that that is one of the reasons that he was imposing a 382 month sentence? He certainly could have, Your Honor, and I would submit that the sentence was imposed because of the 3553A factors and because of the guidelines calculation. And the government actually argued, Your Honor, that the defendant had already gotten a significant break. Because it was but for good fortune and medical care. He was 80 months above the probation. How is that a significant break? And Your Honor, what the government argued was that, but for fortune and expert medical care, the agent would have died. In which case, we would be looking at a more significant sentence. But I think the question is, is whether or not the departure between what was recommended from probation and what was actually assented should give us pause. That maybe the very lengthy recitation of the victim's qualities had an improper influence on how much this person was sentenced. Your Honor, it certainly was above what probation argued, but it was still within the guidelines. So it was presumptively reasonable, and Your Honor, it was within the guidelines, it was within what the government requested as well. So I do not believe that it was because of the victim, rather it was because of the nature of the offense. All right, thank you. Thank you. Mr. Habib, you have two minutes in rebuttal. Thank you. I'd like to touch on each of the three issues briefly. First, with respect to the jury colloquy, homing in Judge Perez on the question of juror four's racial bias. You asked whether bias and fear should be treated differently or could be disentangled. I think on the facts of this case, they're intertwined. Part of the reason that the jurors feared for their safety, as reflected in juror four's comments to the judge, was the race of the people with the phones in the courtroom. And I do want to also call out exactly what Judge Coons said about the deputy's perception of the situation, and this is at 2A321. He didn't like the implication that perhaps at some level the juror was saying a black woman can't be a lawyer. He got his back up. And so that's the record as to racial bias. As to the concern about racial bias, I think the Supreme Court has told us- He's kind of speculating there, isn't he? Or is he making a finding? Your Honor, I think what he's doing is, he had both the memorandum from Mr. Jackson, as well as an oral conversation with Mr. Jackson. Both judge and deputy, and then judge, deputy, and counsel for the parties. So he's drawing all of that, and he is- Describing the perception of his deputy, not something that the jury didn't say anything like that. This is his deputy perceiving that perhaps, I think he even said the word perhaps, that there was some type of racial bias indicated by that, right? That's pretty attenuated. There was no question proposed on that. That's my biggest issue with this. If the defense attorney really thought that there was racial bias behind that, the way, it wouldn't be to declare a mistrial over that. You would ask an additional question to try to get at that, and there was no such request. So I have two responses, Your Honor. First, as to the degree of confidence in Judge Koonce's observation. This comment was made multiple times over the course of the voir dire. The judge said it was a profiling perception. He said that the juror was- It was a finding by Judge Koonce. He was not present, you're right. Of course not, Your Honor. Maybe he repeated it more than once, that this is what his deputy perceived. But that doesn't make it a finding that the juror was, that was the juror's, you know, noted. All I would say, Your Honor, is that in the context of this case, where the deputy is an African-American man, and the judge is an African-American man, who says he has encountered just this kind of bias in his own personal experiences. That those inferences are both supported by the record. Right, but that judge decided there was not a there there, right? So doesn't that cut both ways? Your Honor, he credited the juror's self-assessment of impartiality without questioning on the topic. And if I could return to Judge Bianco's point, the defense repeatedly called this issue to the court's attention. It moved to disqualify this juror, and that's a 2A317, and it repeatedly moved for a mistrial. Where did the defense ever propose a question to address whether or not this was a racial bias issue? Where in the record? No, Your Honor, the defense didn't propose that question. I acknowledge that. But what the defense did do was after the juror had been questioned and had asserted impartiality, the defense said that her assertion was not to be credited and moved to strike her. And the judge was aware of the issue. With the court's indulgence on the self-defense instruction issue, I think, Judge Bianco, you're exactly right that the additional language that was proposed by the defense here, it came verbatim from Getz. And I think when assessing harmlessness here, Wesley in particular bears a close read. Wesley says that the defect in the charge, which was more or less in substance equivalent to the charge that was given here, is that the jury was not specifically directed to focus on the factors that were described in Getz as critical. Wesley didn't give the first sentence that was given by Judge Coons, which is you put yourself in the circumstances and facts as presented. That was absent from Wesley. There was no instruction like that in Wesley. So this is not squarely, as Wesley, the defect is not the same, but my bigger issue is that the instruction wasn't inconsistent with that. And again, for pages and pages in the summation, there was arguments about his eyesight and the prior robberies and how that could have affected whether he thought this was a threat or not. And the government, in its rebuttal, didn't say, you're going to hear instructions from Judge Coons, you don't have to consider that. The government responded on the merits to all those things. His eyesight was really fine, there's no indication he had an eyesight problem. This stuff about prior burglaries is a lie. So there was no suggestion that all these arguments that were being made about the circumstances at the time and his characteristics were somehow out of bounds. So I think on the harmlessness issue is where I'm finding a hard time. So, if I may, Judge, let me just push back on the idea that the instruction is not inconsistent with precedent. The judge says, would a reasonable person faced with the same facts and circumstances that confronted the defendant at the time of their occurrence. If the court doesn't accept that it's comparable to the Wesley instruction, it's certainly comparable to the Getz instruction, which the prosecutor instructed the grand jury that they were to assess the defendant's situation, that was the instruction. It could include everything that went up to that situation. I'm sorry, your honor? It could include everything that went up to that situation and include the physical characteristics of the defendant at the time of the occurrence, which included his eyesight. So I don't necessarily see it as, I agree with you, it would be clearer to have the additional sentence, but I don't see it as telling the jurors they can't consider all those things. Well, let me clarify two points, if I may, your honor. First, the instruction I was just, I read the district court's instruction here. The instruction in Getz was, assess the defendant's conduct, assess reasonableness from the perspective of, quote, a reasonable man in the defendant's situation. That was the Getz instruction to the grand jury. And the New York Court of Appeals said that that instruction was not correct as to a pettit jury. That in fact, there needed to be a specific instruction drawing the juror's attention to factors such as physical attributes and prior experiences. So that language, in my view, is, if anything, slightly more favorable than what Judge Kuntz charged here, which was a reasonable person faced with the same facts and circumstances. The pattern and jury instructions in New York say a reasonable person, defendant's position, knowing what the defendant knew and being in the same circumstance. So it doesn't even exactly match up to what you're saying. It's a little bit better than what Judge Kuntz gave, but that's the pattern jury instruction for New York State. And as this court is sitting and evaluating, because of course, it's a question of federal common law. So if this court is evaluating the substantive content of the federal self-defense instruction, I think it's preferable to look to Getz and Wesley rather than- Let me ask you a question about the sentencing comments. I just want to make sure I understand your argument on that. You're not suggesting that praising a victim, calling them courageous, saying they're a good police officer, law enforcement officer. There's nothing improper about a judge doing that after a victim speaks at the sentencing. That's pretty commonplace, whether it be a rape victim, a victim in a murder, the victim's family. Judges are often very complimentary, obviously, of the victims. That's not what you're objecting to? No, Your Honor. The procedural error is adducing that praise as a basis for the sentence, as Judge Carney has drawn out from the transcript. Well, we don't know that. He did say at the end, for all these reasons, but that doesn't necessarily mean he was including praising the courageousness of the victim. He's doing two things, Your Honor, two separate things that we submit are erroneous. Number one, he's praising the victim. He's also speaking of the need to honor the victim, to salute the victim, to make sure that the world knows the victim's name. And then he says, for all of these reasons. I'm just taking the judge at his word, Your Honor. I'm not extrapolating. I've read it a few times. He didn't say, because of the need to make you known, I'm going to give a higher sentence. I didn't read it that way. I think that's a little bit of a stretch. Well, what's worse in the district court's comments? What's worse is the direct sentence, which in fact precedes the imposition of the sentence. Which is, Agent Harper has our back and this court promises to always have his. That comes one sentence before the judge says, for all these reasons, the court sentences the defendant, Ronald Watson. Suppose the court said something like this. The sentence needs to be high because the court needs to protect law enforcement officers from violent conduct like this. And like Agent Harper, they're courageously serving the public and risking their lives. So this sentence has to be high to protect law enforcement officers. The court needs to protect law enforcement officers and that's why this sentence needs to be high. That would arguably be more responsive to a permissible 3553 consideration. I feel like that's like a 3553-a fact. It's a need to protect the public and to deter, yes. Including law enforcement officers who are risking their lives, right? Right, but that's not what the judge said in this case, Your Honor. What the judge said in this case was, after praising the victim and describing the victim's attributes in a fulsome manner, all attributes, by the way, totally- Is saying the court or the law has the back of law enforcement officers be a rhetorical way of essentially saying the same thing that I just said or no? With respect, Your Honor, no. I think what the judge did in the sentence that the judge wrote immediately before imposing sentence in this case was a personal promise to a specific party appearing before the court. A person who, as the government points out, had spoken, I agree, movingly and with eloquence about his experiences. And the judge made a personal statement directed to that person, not to law enforcement writ large, not to the police writ large, but to a specific person who had been victimized by another person in that courtroom. Okay. In fact, with the court's indulgence, ten seconds, Judge Perez, not only was the sentence imposed here far above probation's recommendation, it was more than 100 months greater than the mean sentence for completed murder for people in criminal history category one. Thank you, Your Honor. Thank you to both of you, we'll reserve decision.